IAN VIGUS and LEAH MOORE VIGUS, Plaintiffs,
v.
MILTON A. LATTA & SONS DAIRY FARMS, INC., a North Carolina Corporation; WILLIAM LATTA, in his official capacity as President, and in his individual capacity; TATE LATTA, in his official and individual capacity; JOLLY BUILDERS, INC., d/b/a AMERICA'S HOME CHECKERS; HAROLD JOLLY, in his capacity as owner-agent for America's Home Checkers, and in his individual capacity; KELLER WILLIAMS REALTY, A North Carolina Corporation; ROBYN MARSHALL, agent for Keller Williams Realty, and in her individual capacity; THE FORD PERRY TEAM; ORANGE REALTY, a North Carolina Corporation; BONNIE GATES, agent for Orange Realty, and in her individual capacity; JOE PHELPS, as agent for Orange Realty and Broker in Charge, and in his individual capacity, Defendants.
No. COA08-700.
Court of Appeals of North Carolina.
Filed May 19, 2009.
This case not for publication
Hairston Lane Brannon, PA, by Anthony M. Brannon, for plaintiff-appellants.
Cheshire & Parker, by D. Michael Parker, for defendant-appellees Milton A. Latta & Sons Dairy Farms, Inc., William Latta, and Tate Latta. Cranfill Sumner & Hartzog LLP, by Daniel G. Katzenbach and Andrew D. Hathaway, for defendant-appellees Jolly Builders, Inc., d/b/a America's Home Checkers, Harold Holly, and Kelly Jolly.
Teague, Campbell, Dennis & Gorham, L.L.P., by Christopher G. Lewis, for defendant-appellees Keller Williams Realty and Robyn Marshall.
Manning Fulton & Skinner P.A., by William C. Smith, Jr., for defendant-appellees Orange Realty, Bonnie Gates, and Joe Phelps.
ROBERT C. HUNTER, Judge.
This case arises out of the sale of a house in Hillsborough, North Carolina, which Ian and Leah Vigus ("Mr. Vigus," "Mrs. Vigus," or collectively "plaintiffs") purchased unseen. After discovering extensive structural damage resulting from termite infestation, plaintiffs filed suit against, inter alia, their real estate agent and her employer, the listing real estate agent and his employer, the sellers of the house, and the home inspector. Summary judgment was granted in favor of the home inspector. The case proceeded to trial against the remaining defendants. After the close of plaintiffs' evidence, the trial court granted motions for directed verdict as to all claims against the multiple defendants.
Plaintiffs now appeal from: 1) the grant of defendants' Motions for Directed Verdict; 2) the denial of plaintiffs' Motion to Reconsider and Motion for New Trial; and 3) the grant of summary judgment for defendant Jolly Builders, Inc., d/b/a America's Home Checkers, and Harold and Kelly Jolly. After careful review, we affirm.

Background
On 22 April 2004, plaintiffs entered into an "Exclusive Right to Represent Buyer-Buyer Agency Agreement" ("Buyers Agreement") with Ms. Robyn Marshall ("Marshall"), a real estate agent employed by Keller Williams Realty ("Keller Williams"). Plaintiffs specifically contracted with Marshall because she was a buyer's agent who would solely represent their interests in any real estate transaction.
Plaintiffs were residing in England at the time, but wished to purchase a home in or around Hillsborough, North Carolina. Mrs. Vigus was pregnant and restricted from traveling by her doctor and Mr. Vigus was not permitted to travel to the United States as he was awaiting approval of his immigration visa. Plaintiffs communicated with Marshall via telephone, facsimile, or mail courier.
Plaintiffs became interested in a house located at 2012 Phelps Road, Hillsborough, North Carolina. The house was listed on the Triangle Multiple Listing Service ("TMLS") by defendant Joe Phelps ("Phelps"), an employee of defendant Orange Realty. Defendants Milton A. Latta & Sons Dairy Farms Inc., William Latta and Tate Latta (collectively "the Lattas") owned the listed property.[1] According to the TMLS data, the house was listed for $225,000 and described as an "[o]ld [f]armhouse," with vinyl siding, built in 1940 and remodeled in the early 1980's. Several of plaintiffs' friends visited the house and took photographs of the exterior, but did not go inside, and reported to plaintiffs that the house "'looked great'".
Upon expressing further interest in the property, plaintiffs received a "State of North Carolina Residential Property Disclosure Statement" in which the Lattas made no representations with regard to each query, except when asked if there had been any room additions or structural changes. The Lattas acknowledged that the "[h]ouse was remodeld [sic] in 1981 or 1982." Mr. Latta testified that he asked Marshall why no representations were made, and Marshall explained that because the house had been used as a rental property, the sellers may not know the "history of the property." According to the text of the Disclosure Statement, the seller is informed, "[i]f you check `No Representation,' you have no duty to disclose the conditions or characteristics of the property, even if you should have known of them."
On 22 April 2004, plaintiffs signed an Offer to Purchase and Contract for the Property in the amount of $220,000. The Offer to Purchase contained the following language:
Wood-Destroying Insects: Unless otherwise stated herein, Buyer shall have the option of obtaining, at Buyer's expense, a report from a licensed pest control operator . . . . The Buyer is advised that the inspection report described in this paragraph may not always reveal either structural damage or damage caused by agents or organisms other than wood-destroying insects.
(Alteration in original.) On 23 April 2004, the contract was accepted by the Lattas. On 30 April 2004, an Additional Provisions Addendum was attached to the contract, which included a "Cost of Repair Contingency" that allowed plaintiffs to terminate the contract if a reasonable estimate of repairs to the property exceeded $1,500.
On 12 May 2004, defendant America's Home Checkers ("Home Checkers") performed an official inspection of the property at plaintiffs' request and issued a report. The report stated that Home Checkers was unable to enter the crawl space under the house, but noted that there were uneven floors throughout the house, as well as other needed repairs. The report indicated that there was "[e]vidence of past pest infestation in attic. Evaluation needed by qualified pest inspector." Mr. Vigus testified that Marshall said "'[e]verything looks fine'" and did not recommend an additional home inspection.
A termite inspection was ordered by Marshall, on behalf of plaintiffs, and the inspector noted in his report that there were "visible signs of termites in front porch, on pillars and whole house."[2] The Official North Carolina Wood-Destroying Insect Information Report admittedly reviewed by plaintiffs stated:
If there is evidence of a previous or an active infestation of subterranean termites and/or other wood-destroying insects in the wooden members, it must be assumed that there is some damage to the wooden members caused by this infestation, no matter how slight. If this is the case, the structural integrity of this property should be evaluated by a qualified building expert.
Mr. Vigus asserted that he and his wife read every report that was sent to them by Marshall, though not always the "small print," and spoke with her often. Mr. Vigus claimed that their telephone bill was approximately $2,000 a month due to his frequent conversations with Marshall. Plaintiffs testified that they individually had conversations with Marshall regarding the termite report and that she told them a termite treatment was needed, but that once the termites were eliminated, there would be no further problems. Marshall then ordered the termite treatment, but according to plaintiffs, Marshall did not advise them to have a qualified building expert assess any resulting damage from the termite infestation. Plaintiffs did not have any other inspections performed prior to purchase.
Plaintiffs were not present for the real estate closing on 21 June 2004 as they were still not able to travel to the United States. Mrs. Vigus moved to the United States on or about 14 July 2004 with her two-month-old son. Soon thereafter, as she was moving her belongings into the house, Mrs. Vigus began to notice "soft spots" and unevenness in the flooring. Mr. Vigus obtained his visa and moved to the United States on or about 22 October 2004. Mr. Vigus then began to uncover the massive extent of the termite damage, which had significantly undermined the structural integrity of the home. Mr. Vigus testified that the dirty carpet attached to a tack strip was the only thing preventing someone from falling through the floor. Mr. Vigus stated that the vinyl sidingwas covering extensive damage to the wood underneath. In many places the "wooden siding, the original siding of the house was becoming disconnected from the decomposed and rotten studs."
David Jones ("Jones"), a home inspector who testified for the plaintiffs, stated that there was severe damage to the floor joists, that the floors were artificially propped up by wood and cinder block, and that the house was likely built "between the mid-1800's and 1920[,]" not 1940 as the TMLS sheet indicated. Jones further testified that the house "had the worst termite damage that [he had] ever seen in 23 years of inspecting houses."
Jeff Nielson, owner of Nielson Construction, testified as to various repair estimates he provided plaintiffs. "The first one, to demo the house and replace the structure, was 250,000. The estimate to complete the renovation from the point of what Ian had already finished was 112,220, and the estimate to complete it plus put a price on what Ian had already done was 159,480." Mr. Vigus testified at trial that, thus far, he had spent approximately $30,000 to $40,000 on materials alone.
On 5 January 2006, plaintiffs filed a complaint against: 1) the Lattas for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, breach of the implied warranty of habitability, and punitive damages; 2) Phelps, Orange Realty, and Bonnie Gates for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, negligence, unfair and deceptive trade practices, and punitive damages; 3) Marshall, Keller Williams Realty, and the Ford Perry Team for intentional misrepresentation, negligent misrepresentation in the alternative, negligence, breach of contract, unfair and deceptive trade practices, and punitive damages; and 4) Home Checkers for negligence, breach of contract, unfair and deceptive trade practices, and punitive damages.
After discovery was complete, all defendants moved for summary judgment. A hearing was held on 16 October 2006. By stipulation, the claims against the Ford Perry Team were dismissed as was the claim for breach of implied warranty of habitability against the Lattas. On 13 December 2006, in two separate orders, the trial court granted summary judgment as to all claims in favor of defendants Home Checkers, Harold Jolly and Kelly Jolly, Orange Realty, and Bonnie Gates. On 10 January 2007, the trial court granted partial summary judgment for Robyn Marshall and Keller Williams.
At trial, plaintiffs' remaining claims included those against: 1) the Lattas for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, and punitive damages; 2) Phelps for intentional misrepresentation and intentional concealment, negligent misrepresentation in the alternative, unfair and deceptive trade practices, and punitive damages; and 3) Marshall and Keller Williams Realty for negligent misrepresentation.
Trial began on 12 March 2007. Plaintiffs presented six witnesses and thirty-six exhibits. Plaintiffs did not call any of the defendants to testify. After the close of plaintiffs' case in chief, defendants moved for a directed verdict on all claims. On 16 March 2007, in open court, the trial judge granted all of defendants' motions for directed verdict. On 26 March 2007, judgment was entered dismissing all claims against Joe Phelps. On 30 March 2007, two judgments were entered dismissing all claims against: 1) Milton A. Latta & Sons Dairy Farms, Inc., William and Tate Latta in their official and individual capacities; and 2) Robyn Marshall and Keller Williams. Plaintiffs filed a Motion to Reconsider and Motion for a New Trial on 17 April 2007, which was denied without a hearing on 1 May 2007. Plaintiffs filed a notice of appeal on 29 May 2007.

Analysis

I. Home Checkers, Harold and Kelly Jolly
Plaintiffs argue that the trial court erred by granting summary judgment for defendant Home Checkers because there were genuine issues of material fact in dispute with regard to two claims.
First, plaintiffs argue that the trial court erred in granting summary judgment for Home Checkers with regard to the claim of negligence. Plaintiffs allege that Home Checkers was negligent in performing its contractual duty to inspect the home as evidenced by the extensive damage that was not discovered upon inspection. There are two key components to this claim: 1) that Home Checkers was negligent because it failed to uncover the extent of the damage to the house; and 2) that Home Checkers did not inspect the crawlspace, an area where there was a significant amount of termite damage.
Secondly, plaintiffs contend that the trial court erred in dismissing its breach of contract claim against Home Checkers. As plaintiffs only address negligence and breach of contract in their brief, all other claims are abandoned. N.C.R. App. P. 28(a), (b)(6).

A. Standard of Review-Summary Judgment
A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). A grant of summary judgment is reviewed de novo by this Court. Falk Integrated Tech., Inc. v. Stack, 132 N.C. App. 807, 809, 513 S.E.2d 572, 574 (1999). On appeal, this Court must determine: "'(1) whether there is a genuine issue of material fact and (2) whether the movant is entitled to judgment as a matter of law.'" McCoy v. Coker, 174 N.C. App. 311, 313, 620 S.E.2d 691, 693 (2005) (quoting NationsBank of N.C. v. Parker, 140 N.C. App. 106, 109, 535 S.E.2d 597, 599 (2000)).
A genuine issue of material fact depends on whether the claim is supported by substantial evidence. Eason v. Union Cty., 160 N.C. App. 388, 391, 585 S.E.2d 452, 455 (2003) "'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quotingThompson v. Wake County Bd. of Educ., 292 N.C. 406, 414, 233 S.E.2d 538, 544 (1977)). All inferences of fact are made in favor of the nonmoving party. McCoy, 174 N.C. App. at 313, 620 S.E.2d at 693.

B. Negligence
Robyn Marshall, on behalf of plaintiffs, signed a contract with Home Checkers on 12 May 2004 for inspection services. Plaintiffs claim that Home Checkers negligently performed this contract. It has been recognized in this State that when a plaintiff seeks only economic damages arising out of a contractual relationship with a defendant, only the law of contracts governs the claim, not the law of torts. Ports Authority v. Roofing Co., 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), rejected on other grounds by Trustees of Rowan Tech. v. Hammond Assoc., 313 N.C. 230, 328 S.E.2d 274 (1985). Our Supreme Court in Ports Authority recognized exceptions to that general rule, but further stated: "our research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." Id. at 83, 240 S.E.2d at 351. None of the four enumerated exceptions found in Ports Authority apply to this case, and while Ports Authority indicated that the exceptions listed may not be exclusive, our Courts have not found further exceptions subsequent to the economic loss doctrine that was promulgated in that case.
Accordingly, the trial court did not err in granting summary judgment for Home Checkers with regard to this negligence claim as plaintiffs were seeking economic damages arising out of a breach of contract.[3]

C. Breach of Contract
"A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." Dysart v. Cummings, 181 N.C. App. 641, 647, 640 S.E.2d 832, 836 (2007).
Plaintiffs did not allege in their complaint that a particular provision in the contract between plaintiffs and Home Checkers was breached.[4] Indeed, the crux of plaintiffs' argument is that Home Checkers inspected the property but did not uncover the extent of the termite damage; therefore, Home Checkers breached its duty to thoroughly inspect the property.
Upon review, the contract clearly states that plaintiffs requested a "limited visual inspection" of the structure. In signing the contract, plaintiffs "agree[d] to assume all risk for all conditions which are concealed from view at the time of the inspection." Furthermore, "[t]ermites, pests, or other wood destroying organisms" were outside the scope of the inspection according to the contract.
In reviewing the record as presented to the trial court at the time of the hearing on the summary judgment motion, we find that plaintiffs did not forecast sufficient evidence to support their breach of contract claim. Home Checkers noted multiple problems with the property in the inspection report, including the sagging floors, and stated that the issues warranted additional attention/repair or that they should be evaluated by a licensed contractor. Based on a "limited visual inspection," Home Checkers was not required to lift up the carpeting, pull off the vinyl siding, or cut out portions of the sheet rock to view behind the walls. In fact, the contract excludes inspection for pests, but Home Checkers still noted evidence of pest infestation in the attic, putting plaintiffs on notice of a potential pest problem.
With regard to the crawl space, Kelly Jolly stated the following in a sworn affidavit:
7. During the inspection I viewed the crawlspace from the opening and saw large amounts of hanging insulation throughout the crawlspace area that was visible from the crawlspace opening. As a result, I did not feel that it was safe for me to enter and inspect the crawlspace because of the possibility of electrical wiring which could be loose or hanging but obscured from view by the hanging insulation. I have seen dangerous electrical conditions in crawlspaces on previous inspections, and unless I can clearly see if there are any such conditions in a crawlspace I do not believe it is safe enough for me to enter a crawlspace.
. . . .
9. On page 6 of our inspection report I marked the box indicating that the crawlspace was viewed from the access opening only, and I wrote under the "Comments" section that the inspection of the crawlspace was limited to an external view only and that no inspection could be made of framing, plumbing, electrical or HVAC components. Additionally, next to the box indicating that the crawlspace was viewed from the access opening only, there is a *, which corresponds to a key at the top of the page. The key states that a * "Signifies items that warrant attention/repair."
In its motion for summary judgment, Home Checkers provided the trial court with Section .1100 of the North Carolina Home Inspector Standards of Practice and Code of Ethics, which contains a provision stating that a home inspector is not required to enter an area that may be dangerous to him or her. Plaintiffs point to the inspection report of David Jones, issued on 8 November 2004 after plaintiffs had moved in, as evidence that the crawl space was accessible. Jones stated in his report:
Most of the crawl space below the first floor of the house was accessible, but areas below the right rear corner of the living room, the rear third of the center hall and stairwell, and the rear of the left room could not be accessed because rigid metal ductwork blocked access. Some other areas were difficult to access because of fallen insulation, but were accessible.
The fact that Jones was able to enter the crawl space on 8 November 2004 does not provide evidence that Home Checkers breached any provision of its contract when it claimed that it could not safely access that area of the house on 12 May 2004.[5]
In sum, plaintiffs are unable to point to a provision of the contract that was breached and rely solely on the fact that there was damage to the property not discovered by Home Checkers. Because plaintiffs failed to provide a sufficient forecast of evidence in support of their breach of contract claim, the trial court did not err in granting summary judgment for Home Checkers.

II. The Lattas

A. Standard of Review  Directed Verdict
"This Court reviews a trial court's grant of a motion for directed verdict de novo." Herring v. Food Lion, LLC, 175 N.C. App. 22, 26, 623 S.E.2d 281, 284 (2005). "The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury." Davis v. Dennis Lilly Co., 330 N.C. 314, 322, 411 S.E.2d 133, 138 (1991). "If there is more than a scintilla of evidence supporting each element of the nonmovant's case, the motion for directed verdict should be denied." Snead v. Holloman, 101 N.C. App. 462, 464, 400 S.E.2d 91, 92 (1991). "The reviewing court does not weigh the evidence or assess credibility, but takes petitioners' evidence as true, resolving any doubt in their favor." Jones v. Robbins, ___ N.C. App. ___, ___, 660 S.E.2d 118, 120, disc. review denied, 362 N.C. 472, 666 S.E.2d 120 (2008).
Plaintiffs argue that the trial court erred in granting the Lattas' motion for directed verdict with regard to the claims against them for intentional misrepresentation, intentional concealment, negligent misrepresentation as pled in the alternative, and punitive damages because plaintiffs presented sufficient evidence at trial as to these claims. We will now review the grant of directed verdict as to each claim presented at trial.

B. Fraud Based on Intentional Misrepresentation
Plaintiffs claimed at trial that the Lattas fraudulently misrepresented the extensive termite damage. Our Supreme Court has defined fraud as:
(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.
Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974). "Additionally, plaintiff's reliance on any misrepresentations must be reasonable." RD&J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 744, 600 S.E.2d 492, 498 (2004). Plaintiffs must establish evidence of each element of the claim in order to survive a motion for directed verdict. Snead, 101 N.C. App. at 464, 400 S.E.2d at 92.
Pertaining to the claim for intentional misrepresentation in this case, the two threshold questions to consider are whether plaintiffs' evidence was sufficient to show that the Lattas in fact made an intentional misrepresentation, and if so, whether plaintiffs reasonably relied on the misrepresentation.

i. Evidence of Intentional Misrepresentation
To qualify as an intentional misrepresentation for purposes of a fraud claim, the misrepresentation must be "definite and specific." Libby Hill Seafood Restaurants, Inc. v. Owens, 62 N.C. App. 695, 698, 303 S.E.2d 565, 568, disc. review denied, 309 N.C. 321, 307 S.E.2d 164 (1983). Plaintiffs allege that the Lattas 1) placed vinyl siding over rotten wood; 2) propped up the floor with wooden devices and cinder blocks to disguise the true condition of the sagging floors; and 3) the TMLS data sheet misrepresented the age of the home and renovations supposedly made in the 1980's. Plaintiffs claim that these actions amounted to intentional misrepresentations. However, plaintiffs failed to present sufficient evidence at trial as to these claims.
The testimony and exhibits presented at trial tended to show that the Lattas answered "no representation" to almost every query on the Residential Property Disclosure Form, including whether there was a present infestation of termites or damage due to a past infestation, and they made no verbal assertions to the plaintiffs, either personally or through their agent, regarding termites in the home. Plaintiffs did not ask the Lattas if they were aware of any current infestation or any damage to the house due to termites.
The fact that the Lattas chose to place vinyl siding on the house and prop up the floors is not a definite and specific assertion that there were no termites in the home or resulting damage from an infestation. Even if the Lattas were attempting to conceal damage through use of the vinyl siding, plaintiffs presented no evidence of such scienter at trial. With regard to the crawl space, the Lattas did not bar entrance to that area and the props were clearly visible upon inspection, as testified to by plaintiffs' expert, David Jones. Finally, plaintiffs assert that the Lattas misrepresented the age of the home on the TMLS sheet and that they were mislead by the claim that the house had been renovated in the 1980's, as this statement indicated that the house was habitable and cared for. In fact, the TMLS sheet clearly stated that the "Information deemed RELIABLE but not GUARANTEED." Moreover, the Lattas checked "no representation" with regard to the age of the structure on the Residential Property Disclosure Statement. Mr. Vigus testified that he sought clarification of what the remodel entailed and was informed by Marshall that "the old log cabin or structure on the back of the house had been taken down at that time and a kitchen and dining room added and that's when the total remodel of the house took place." There was no evidence presented that this "remodel" did not actually occur. Most importantly, the age of the house and the remodel does not relate to plaintiffs' damages, which resulted from termite infestation.
Absent some evidence that the Lattas intentionally misrepresented material facts, specifically regarding termites or termite damage, an action for fraud cannot be supported.

ii. Reasonable Reliance by Plaintiffs
Assuming, arguendo, that the Lattas misrepresented the condition of the house, "when the seller of property makes affirmative misrepresentations, the failure of the purchaser to make diligent inquiries when he has notice of a problem precludes a recovery for fraud." Robertson v. Boyd, 88 N.C. App. 437, 443, 363 S.E.2d 672, 676 (1988). Therefore, even if the Lattas made misrepresentations, reasonable reliance on the misrepresentations must still exist to bring an action in fraud.
"With respect to the purchase of property, `[r]eliance is not reasonable if a plaintiff fails to make any independent investigation' unless the plaintiff can demonstrate: (1) `it was denied the opportunity to investigate the property,' (2) it `could not discover the truth about the property's condition by exercise of reasonable diligence,' or (3) `it was induced to forego additional investigation by the defendant's misrepresentations.'"
MacFadden v. Louf, 182 N.C. App. 745, 747-48, 643 S.E.2d 432, 434 (2007) (quoting RD&J Props., 165 N.C. App. at 746, 600 S.E.2d at 499). "'The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion.'" Willen v. Hewson, 174 N.C. App. 714, 718, 622 S.E.2d 187, 191 (2005) (quoting State Properties, LLC v. Ray, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002)), disc. review denied, 360 N.C. 491, 631 S.E.2d 520 (2006). This requirement that plaintiff undergo independent investigation comports with the policy of the courts in this State, which is, "'on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interest.'" Libby Hill Seafood, 62 N.C. App. at 700, 303 S.E.2d at 569 (quoting Calloway v. Wyatt, 246 N.C. 129, 134-35, 97 S.E.2d 881, 886 (1957)). Because plaintiffs in this case failed to make any independent inquiry into the structural integrity of the property after receiving notice of potential problems, we must find that any reliance upon purported misrepresentations by the Lattas was not reasonable. In the case at bar, the following facts support defendants' contention that plaintiff failed to show reasonable reliance on any alleged misrepresentations by the Lattas: 1) the termite inspector found termites throughout the house; 2) the crawl space had not been examined; 3) the home inspector noted the existence of a "pest" infestation in the attic[6]; 4) the home inspector found uneven floors throughout the house; 5) no representations had been made as to termite damage on the disclosure form; 6) the Official North Carolina Wood-Destroying Insect Information Report placed plaintiffs on notice that potential structural defects may exist due to termite infestation; and 7) had plaintiffs sought the advice of a qualified building expert, it is likely that he/she would have discovered the extensive damage to the house. All of these facts were revealed through plaintiffs' own evidence at trial and demonstrate unreasonable reliance on the part of plaintiffs.
In addition, neither the Lattas nor Phelps made any assurances as to the condition of the property, and plaintiffs were not discouraged from further investigation by the Lattas, who acquiesced to every request to inspect made by plaintiffs. Upon her first visit to the home, Mrs. Vigus realized that the floors were unstable. Though plaintiffs repeatedly assert that they were in England during the entire process, the fact that plaintiffs could not observe or supervise the inspections, or even view the property, does not excuse any lack of due diligence upon receiving notice that there were potential structural defects, as intimated by the termite inspection report and the general home inspection report.
The case of Robertson v. Boyd is analogous in many respects to the present case. There, the plaintiffs claimed that the defendant sellers, the defendant listing agent, and the defendant termite inspector knew of termite damage under the home and "'collectively and/or individually engaged in an effort to keep the Plaintiffs from discovering [the termite damage].'" Robertson, 88 N.C. App. at 442, 363 S.E.2d at 675-76. The Court granted defendants' 12(b)(6) motions to dismiss in part because the "plaintiffs' complaint allege[d] facts which show[ed] that they had notice of possible termite damage and failed to investigate." Id., 363 S.E.2d at 676. The Boyd Court noted that the termite report received by the plaintiffs stated that parts of the house were inaccessible, that there was some termite damage seen in the front of the house, and that the observed damage should be "evaluated by a qualified building expert." Id. Because the plaintiffs in Boyd had notice of potential termite damage, they could not reasonably rely on affirmative misrepresentations by the defendants. Id. The Court held:
In an action with respect to realty . . . the purchaser can recover only if he has been fraudulently induced to forego inquiries which he otherwise would have made. An action in fraud will not lie where the purchaser has full opportunity to make inquiries but neglects to do so through no artifice or inducement of the seller.
Id., 363 S.E.2d at 675 (citing Libby Hill Seafood, 62 N.C. App. at 698, 303 S.E.2d at 568). In this case, plaintiffs were on notice that there were termites present in the "whole house" but failed to inquire further through no artifice of the Lattas.
In sum, we find that plaintiffs failed to provide a scintilla of evidence that the Lattas intentionally misrepresented the condition of the house or the extent of the termite infestation, and plaintiffs' failure to further inspect upon notice of potential defects signifies an absence of reasonable reliance on any purported misrepresentations. Accordingly, the intentional misrepresentation claim should not have been presented to the jury and we find no error in the trial court's grant of directed verdict as to this claim.

C. Fraud Based on Intentional Concealment
Plaintiffs further claim that they provided sufficient evidence that the Lattas failed to disclose the extent of the termite damage, and in fact attempted to conceal it with vinyl siding and floor props. This fraud claim is based upon a breach of the duty to disclose a material fact, as opposed to an affirmative misrepresentation.
This State has long recognized that "[w]here a material defect is known to the seller, and he knows that the buyer is unaware of the defect and that it is not discoverable in the exercise of the buyer's diligent attention or observation, the seller has a duty to disclose the existence of the defect to the buyer." In such cases, suppressio veri (a failure to disclose the truth) is as much fraud as suggestio falsi (an affirmative false representation).
Everts v. Parkinson, 147 N.C. App. 315, 321, 555 S.E.2d 667, 672 (2001) (quoting Carver v. Roberts, 78 N.C. App. 511, 512-13, 337 S.E.2d 126, 128 (1985)).
The facts of this case indicate that the Lattas did not disclose the extensive damage to the house, which was a material defect that they may have been aware of and thus had a duty to disclose if the defects were unknown to the buyer and were not "'discoverable in the exercise of the buyer[s'] diligent attention or observation.'" Id. (quoting Carver, 78 N.C. App. at 512-13, 337 S.E.2d at 128).
While there is no requirement of reasonable reliance in an action for fraud based on the breach of a duty to disclose, the party bringing the claim must still show that he or she exercised due diligence in attempting to discover defects.
This requirement serves the same purpose as the reasonable reliance requirement in other fraud claims: it precludes a claim of fraud where a plaintiff has been negligent or inattentive to his own interests. This is because, if a defect is discoverable in the exercise of a buyer's diligent attention or observation, and the buyer fails to employ diligent attention or observation (and thus fails to discover the defect), a claim for fraud will not stand because in such a situation there is no duty on the part of the seller to disclose the defect.
Id. at 325-26, 555 S.E.2d at 674.
The primary question with regard to this claim is whether plaintiffs could have discovered the defects in the property through due diligence. If plaintiffs failed "to employ diligent attention or observation," then there was "no duty on the part of [the Lattas] to disclose the defect," if in fact they were aware of it. Id. at 326, 555 S.E.2d at 674. For the same reasons that plaintiffs failed to show reasonable reliance at trial, as detailed supra, they also failed to show due diligence in discovering the extent of the damage to the house when they were on notice of the termite infestation.
Plaintiffs contend that Everts supports their claim that the Lattas were liable for failing to disclose a material fact. There, the buyers of a house brought a claim of fraud against the defendant seller for failure to disclose the fact that there was significant water intrusion into the house that resulted from a defective synthetic stucco exterior. Id. at 318, 555 S.E.2d at 670. The Court reversed the trial court's grant of summary judgment for the defendant because it found an intent to deceive on the part of the defendant as evidenced by his attempts to repair rotting brick mold, replace other rotten portions of windows, and apply a "decorative" stucco band around the windows that would not solve the leakage problem. Id. at 321-25, 555 S.E.2d at 672-74. The defendant admitted that he did not disclose any of the damage or repair work completed. Id. at 324, 555 S.E.2d at 674. Plaintiffs obtained a home inspection in which no rot or water infiltration was discovered. Id. at 327, 555 S.E.2d at 675. The inspector filed an affidavit which stated, "the `decorative bands,' which had been installed around the windows before his inspection, `concealed the joint where the synthetic stucco met the window brick molding,' and that, as a result, he `was not able to visually observe the perimeter joints of the exterior windows.'" Id. As a result of finding that defendant may have attempted to deceive the buyers, and that the inspector did not find any indication of the underlying problem potentially due to the defendant's "repairs," the Court held, "[v]iewing the evidence in the light most favorable to plaintiffs, we believe there are genuine issues of material fact as to whether the alleged defects were discoverable in the exercise of plaintiffs' diligent attention or observation and, therefore, whether [the defendant] had a duty to disclose the defects." Id.
Unlike in Everts, plaintiffs' own evidence in the case sub judice established that they were aware of the potential defects in the house  that the entire house they were buying unseen was infested with termites, that an additional inspection by a qualified building expert was recommended, that there were uneven floors, and that the crawl space had not been inspected where floor props were readily observable. It is arguable that the vinyl siding covered up a "red flag," but that does not excuse plaintiffs from using due diligence in conducting further inspections in this case, when many other red flags had been discovered.
Accordingly, the trial court did not err in granting the Lattas' motion for directed verdict as to fraud based on intentional concealment.

D. Negligent Misrepresentation
"'The tort of negligent misrepresentation occurs when in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information.'" Id. at 328, 555 S.E.2d at 676 (quoting Fulton v. Vickery, 73 N.C. App. 382, 388, 326 S.E.2d 354, 358, disc. review denied, 313 N.C. 599, 332 S.E.2d 178 (1985)). "Justifiable reliance is an essential element of both fraud and negligent misrepresentation." Helms v. Holland, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996).
Furthermore, a "directed verdict [is] . . . proper if plaintiffs' evidence establishes their own contributory negligence . . . ." Stanford v. Owens, 76 N.C. App. 284, 287, 332 S.E.2d 730, 732 (1985).
Where a "person having the capacity to exercise ordinary care . . . fails to exercise such care, and such failure, concurring and cooperating with the actionable negligence of defendant contributes to the injury complained of, he is guilty of contributory negligence. Ordinary care is such care as an ordinarily prudent person would exercise under . . . similar circumstances to avoid injury." In North Carolina, a finding of contributory negligence poses a complete bar to a plaintiff's negligence claim.
Swain v. Preston Falls E., L.L.C., 156 N.C. App. 357, 361, 576 S.E.2d 699, 702 (2003) (quoting Clark v. Roberts, 263 N.C. 336, 343, 139 S.E.2d 593, 597 (1965)). Thus, justifiable reliance (an element of negligent misrepresentation) and contributory negligence (a defense to negligent misrepresentation) are closely associated bars to recovery. If a plaintiff's own evidence tends to show that he/she was not justified in relying upon the misrepresentations of a defendant, then he/she is in effect contributorily negligent. See Stanford, 76 N.C. App. at 287, 332 S.E.2d at 732.
Here, there was no evidence presented at trial that the Lattas supplied false information as guidance in a business transaction. As found supra, the data on the TMLS sheet regarding the age of the farm house and the remodeling was not material with regard to termite infestation and damage. The Lattas never represented that there were no termites present in the house or that there was no damage as a result of an infestation.
Assuming, arguendo, that false information was supplied, the element of justifiable reliance bars plaintiffs' claim for negligent misrepresentation. Plaintiffs were made aware by Home Checkers that there were pests in the attic and uneven floors. The termite inspector informed plaintiffs that there were termites in the whole house and that a qualified building expert should evaluate the premises. Plaintiffs failed to further investigate. Thus, the trial court was correct in granting the motion for directed verdict as to this claim.

E. Punitive Damages
The trial court did not err in granting the motion for directed verdict as to punitive damages as there were no remaining claims upon which punitive damages could be awarded against the Lattas.

III. Joe Phelps
At trial, plaintiffs claimed that Phelps, the Lattas' listing agent, committed intentional misrepresentation, intentional concealment, negligent misrepresentation in the alternative, unfair and deceptive trade practices, and that plaintiffs were entitled to punitive damages.

A. Fraud Based on Intentional Misrepresentation
As previously stated, to establish a claim for intentional misrepresentation, plaintiffs were required to provide sufficient evidence at trial that Phelps made an affirmative, knowing or reckless, misrepresentation to plaintiffs regarding a material fact on which plaintiffs justifiably relied to their detriment. Libby Hill Seafood, 62 N.C. App. at 695, 303 S.E.2d at 568. Plaintiffs' claim is without merit.
Plaintiffs never spoke to Phelps, and he never made any affirmative claims to Marshall that the house was structurally sound or free of termites. Plaintiffs cannot show that they ever relied on any affirmative statements by Phelps. He never discouraged any inspections from taking place or disputed the findings of the reports that indicated a termite infestation and possible structural instability.
As with the intentional misrepresentation claim against the Lattas, plaintiffs' reliance on any purported misrepresentations would be unreasonable under the circumstances of this case as they had notice of the problem and failed to further investigate. Goff v. Realty & Insurance Co., 21 N.C. App. 25, 30, 203 S.E.2d 65, 68 (directed verdicts were proper in favor of the defendants' listing agent and seller where listing agent incorrectly informed the plaintiff buyers that there was not a septic tank or drainage problem on the property because the "[d]efendants resorted to no artifice which was calculated to induce plaintiffs to forego investigation"), cert. denied, 285 N.C. 373, 205 S.E.2d 97 (1974). Hence, a directed verdict was properly granted in favor of Phelps with regard to intentional misrepresentation.

B. Fraud Based on Intentional Concealment
The primary question with regard to this claim is whether plaintiffs provided sufficient evidence at trial that Phelps failed to disclose a material fact that he was aware of, which plaintiffs could not discover through the use of due diligence. Everts, 147 N.C. App. at 321, 555 S.E.2d at 672. Since plaintiffs allege that Phelps failed to disclose the same material facts as the Lattas, and we previously concluded that plaintiffs' did not utilize due diligence in the discovery of these facts, it follows that an action for failure to disclose against Phelps cannot lie. Therefore, the trial court properly granted the motion for directed verdict as to this claim.

C. Negligent Misrepresentation
The motion to dismiss with regard to the claim of negligent misrepresentation should not have been granted if plaintiffs provided sufficient evidence that Phelps "'supplie[d] false information for the guidance of others in a business transaction, without exercising reasonable care in obtaining or communicating the information.'" Id. at 328, 555 S.E.2d at 676 (quoting Fulton, 73 N.C. App. at 388, 326 S.E.2d at 358). Plaintiffs must also have shown that they justifiably relied on the false information. Helms, 124 N.C. App. at 635, 478 S.E.2d at 517.
As we previously found, Phelps did not make any affirmative statements as to a material issue in this case. Since he did not supply false information, we must conclude that the directed verdict was properly granted. Assuming, arguendo, that he did supply false information, as we previously determined with regard to the same claim against the Lattas, plaintiffs have not shown justifiable reliance on any such statements by Phelps.

D. Unfair and Deceptive Practices
In North Carolina, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1(a) (2007).
In order to prevail under this statute plaintiffs must prove: (1) defendant committed an unfair or deceptive act or practice, (2) that the action in question was in or affecting commerce, (3) that said act proximately caused actual injury to plaintiff. Plaintiffs do not have to prove fraud, bad faith, or intentional deception, but proof of fraud necessarily constitutes a violation of the statute. In determining whether a representation is deceptive, its effect on the average consumer is considered. Conduct is unfair or deceptive if it has the capacity or tendency to deceive.
Canady v. Mann, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992) (citations omitted).
There was no evidence presented at trial that Phelps engaged in unfair or deceptive acts or practices that proximately caused actual injury to plaintiff. Plaintiffs failed to show that Phelpsdeceived them in any way. He made no affirmative statements regarding the structural integrity of the house, and he never attempted to thwart any further investigation by plaintiffs, who were on notice of a potentially serious defect in the house. Accordingly, the trial court was correct in granting the motion for directed verdict as to this claim.

E. Punitive Damages
The trial court did not err in granting the motion for directed verdict as to punitive damages as there was no remaining claim upon which punitive damages could be awarded against Phelps.

IV. Robyn Marshall and Keller Williams Realty

Negligent Misrepresentation
The only claim against Marshall and Keller Williams Realty at trial was negligent misrepresentation. In support of this allegation, plaintiffs claim that Marshall told them that the house was "fine" and that everything would be okay once the termites were treated. She further stated that her mother had termites and that once they were treated, there were no further problems. Plaintiffs contend that Marshall never advised them to obtain any additional inspections upon reviewing the termite report and general home inspection report. Plaintiffs also take issue with the fact that Marshall had never sold a house in Hillsborough before and that she asked Phelps to refer inspectors.
Ms. Vicki Ferneyhough ("Ferneyhough"), plaintiffs' real estate expert, testified that these actions by Marshall were improper. Ferneyhough further stated that, in her opinion, Marshall offered a negligent misrepresentation with regard to the two inspection reports "[b]ecause she basically was told on the inspection report that the inspector did not have the opportunity to look at the crawlspace and look under the house, she was told on a second inspection report that there was visible infestation of termites, and at that point nothing else got done." Ferneyhough testified that Marshall had a "higher duty" because her clients were in England and unable to view the house.
However, plaintiffs presented no evidence that Marshall made any affirmative statements about the structural integrity of the house, most of which was not readily visible to her. While Marshall did not advise plaintiffs to seek further inspections, there was no evidence presented at trial that she attempted to dissuade plaintiffs from further investigation. Marshall may have assured plaintiffs that everything would be "fine" once the termites were treated, but that is not the same as saying there is no structural damage and you should not further investigate. In fact, the Exclusive Right to Represent Buyer signed by the parties contains the following clause:
In addition to the services rendered to Buyer by the Agent under the terms of this Agreement, Buyer is advised to seek other professional advice in matters of law, taxation, financing, surveying, wood-destroying insect infestation, structural soundness, engineering, and other matters pertaining to any proposed transaction.
(Emphasis added.)
While Marshall may have failed to represent her clients in accord with the standards of her profession, her actions do not amount to negligent misrepresentation, the only claim against her at trial.
Because plaintiffs cannot show that false information was negligently given by Marshall, the trial court was correct in granting the motion for directed verdict in favor of Marshall and her employer Keller Williams.

V. Motion for Reconsideration and Motion for a New Trial
Plaintiffs submitted a Motion for Reconsideration and Motion for a New Trial pursuant to N.C. Gen. Stat. § 1A-1, Rule 59 (2007), which was denied. "The trial court's discretionary ruling under Rule 59 in either granting or denying a motion for a new trial may be reversed on appeal `only in those exceptional cases where an abuse of discretion is clearly shown.'" Hughes v. Rivera-Ortiz, 187 N.C. App. 214, 217, 653 S.E.2d 165, 168 (2007) (quoting Anderson v. Hollified, 345 N.C. 480, 483, 480 S.E.2d 661, 663 (1997)), affirmed in part, 362 N.C. 501, 666 S.E.2d 751 (2008). "Our review of the trial court's decision to enter an order on [plaintiffs'] motion under Rules 59 and 60 without notice or a hearing is limited to whether the trial judge abused his discretion." Ollo v. Mills, 136 N.C. App. 618, 625, 525 S.E.2d 213, 217 (2000). The trial judge determined that no claims were appropriate for jury determination. It was in his sound discretion to decide whether a new trial was warranted. Based on our discussion supra, we find there was no abuse of discretion in his decision to deny a new trial without a hearing.

Conclusion
We conclude that, based upon the evidence presented, the trial court did not err in granting summary judgment for Home Checkers, Harold and Kelly Jolly. We further conclude that the trial court properly granted defendants' motions for directed verdict as to all claims, and that no error occurred in the trial court's denial of plaintiffs' motion for reconsideration and motion for a new trial.
Affirmed.
Judges WYNN and ERVIN concur.
Report per Rule 30(e).
NOTES
[1] William Latta was sued in his official capacity as president of Milton A. Latta & Sons Dairy Farms, Inc. and in his individual capacity. Tate Latta was sued in his official capacity as an officer of the corporation and in his individual capacity.
[2] This report is not dated; however, an invoice was submitted to Keller Williams on 28 May 2004.
[3] Plaintiffs' claims against other defendants in tort, discussed infra, are not barred by the economic loss doctrine even though there was a contractual relationship between the parties, because the fraud and negligent misrepresentations alleged by plaintiffs fall outside the scope of the contracts involved.
[4] Plaintiffs did not file a response to Home Checkers' motion for summary judgment.
[5] On 30 November 2004, plaintiffs filed a complaint against Kelly Jolly with the N.C. Home Inspector Licensure Board. At the time of summary judgment, the Board had not completed its investigation.
[6] While it is not clear from the evidence in this case if the "pests" referred to were indeed termites, plaintiffs made no further inquiry into this finding by the home inspector.